# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2855 | **DATE** | 9/4/2003 |
| **CASE TITLE** | MARLELY MOULDINGS LIMITED vs. MIKRON INDUSTRIES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held and continued to 9/18/03 at 9:00 a.m. Enter Memorandum Opinion And Order on the claim construction of the patent in dispute.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | SEP 0 5 2003 | |
| | Notices mailed by judge's staff. | | date docketed | 59 |
| | Notified counsel by telephone. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | 03 SEP -4 PM 6:06 | SEP 0 5 2003 | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARLEY MOULDINGS LIMITED, a Nevada )
Corporation, )
 )
 Plaintiff, )
 ) No. 02 C 2855
 v. )
 )
MIKRON INDUSTRIES, INC., ) Judge John W. Darrah
a Washington Corporation, )
 )
 Defendant. )

DOCKETED
SEP 0 5 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Marley Mouldings Limited ("Marley"), commenced a patent infringement action against Mikron Industries, Inc. ("Mikron") for the infringement of United States Patent 5,951,927 ("927 Patent"). In June 2003, a *Markman* hearing was held. Presently before the Court is the claim construction of the patent in dispute.

To construe a patent claim, a court analyzes the intrinsic evidence of the record, which includes the claims and written description of the patent itself, and the prosecution history if it is in evidence. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) (*Altiris*); *Biovail Corp. v. Andrx Pharmaceuticals, Inc.*, 239 F.3d 1297, 1300 (Fed. Cir. 2001) (*Biovail*).

When analyzing the intrinsic evidence, the court starts with the language of the claims and engages in a "heavy presumption" that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art. *Altiris*, 318 F.3d at 1369. Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrates an intent to deviate from that meaning. The specification is highly relevant to the claim construction analysis. The specification is the single

best guide to the meaning of a disputed term. *See Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (*Teleflex*). However, while the claims must be read in view of the specification, limitations from the specification are not read into the claim. *Teleflex*, 299 F.3d at 1326. Dictionary definitions may also be consulted in establishing a claim term's ordinary meaning. *Altiris*, 318 F.3d at 1369.

Terms in a claim are to be given their ordinary and accustomed meaning. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999) (*K-2*). The ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one unless a different meaning is clearly and deliberately set forth in the intrinsic evidence or the ordinary and accustomed meaning of the disputed term would deprive the claim of clarity – then extrinsic evidence may be used to ascertain the proper meaning of the term. *K-2*, 191 F.3d at 1362-63. Limitations that do not exist in a claim should not be read into that claim. However, claim language must be read consistently with the totality of the patent's applicable prosecution history. *Biovail*, 239 F.3d at 1300. "In judicial 'claim construction' the court must achieve the same understanding of the patent ... as would a person experienced in the technology of the invention. Such a person would not rely solely on a dictionary of general linguistic usage, but would understand the claims in light of the specification and the prior art, guided by the prosecution history and experience in the technological field." *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999).

Reliance on extrinsic evidence is improper if the intrinsic evidence unambiguously describes the scope of the patented invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (*Vitronics*). However, the court is not barred from ever considering extrinsic evidence. *See Plant Genetic Sys. v. Dekalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003) (*Dekalb*);

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (*Pitney Bowes*). The court may not rely on extrinsic evidence in claim construction to contradict the meaning of the claims discernible from the intrinsic evidence. *See Pitney Bowes*, 182 F.3d at 1308; *Vitronics*, 90 F.3d at 1583. Extrinsic evidence, including expert testimony, may be consulted to ensure that the court's claim construction is not inconsistent with the expressed and widely held understanding to one in the field, *see Dekalb*, 315 F.3d at 1346; *Pitney Bowes*, 182 F.3d at 1308, for example, relying on extrinsic evidence to understand the underlying technology to ensure that the court's interpretation is not inconsistent with one skilled in the art. *See Dekalb*, 315 F.3d at 1346; *Pitney Bowes*, 182 F.3d at 1308-09.

The patent in dispute, Patent No. 5,951,927, is entitled: Method Of Making A Polymer And Wood Flour Composite Extrusion. Claim 1 is the only independent claim that is being asserted in the present action. The remaining asserted claims, 2, 3, and 5, all depend from Claim 1.

The parties dispute several claim limitations within Claim 1. Claim 1 states:

> A method of forming a solid elongated member of predetermined profile for use as a door, window or frame molding, comprising the steps of:
>
> encapsulating wood flour particles with a polymer resin in an extrudable material by high intensity mixing, said extrudable material consisting essentially of, in parts (volume):
> 
> | | |
> |---|---|
> | polymer resin: | in an amount of up to 100 |
> | wood flour: | 15-140 |
> | stabilizers: | in an amount up to 5 |
> | lubricants: | in an amount up to 5 |
> | process aids: | in an amount up to 10, |
>
> extruding and cutting said extrudable material to form pellets of said extrudable material,

mixing additional polymer resin and a non-aqueous blowing agent
with said pellets to form an extrudable foam material,

compressing said extrudable foam material at a compression stage by
passage through an orifice, said orifice having at one end thereof a
predetermined profile, said foam material consisting of, in parts
(volume):

| | |
|---|---|
| polymer resin: | in an amount up to 100 |
| wood flour: | 15-140 |
| stabilizers: | in an amount up to 5 |
| lubricants: | in an amount up to 5 |
| process aids: | in an amount up to 10 |
| blowing agents: | .2 to 5 |

expanding said foam material through a shaper, said shaper having an
internal solid surface defining a channel for said foam material, and
solidifying said foam material to form a solid elongated member.

### *Preamble*

The parties dispute the effect of the preamble language of Claim 1 consisting of "for use as a door, window, or frame molding." Marley asserts that the cited language is used as non-limiting examples of potential end uses of the profile made by the patened process. Mikron asserts that the language limits the process to decorative moldings for these specific uses.

"Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal quotations omitted) (*Catalina*). Generally, a preamble limits the invention if it recites essential structure or steps or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*, 182 F.3d at 1305. The preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *See Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir.

4

1997). However, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Catalina*, 289 F.3d at 809.

In the instant case, the patent claims, specification, and prosecution history demonstrate that the preamble phrase "for use as a door, window, or frame molding" is not a limitation on Claim 1. The phrase is not necessary or essential to understand the terms or limitations in the claim body. The specification, twice, includes the language "has use in moldings, window and door frames *and similar types of applications*". (Emphasis added). In addition, the applicants added the cited language during the prosecution of the application that matured into U.S. Patent No. 5,847,016, (the 927 Patent is a divisional application of the 5,847,016 Patent), and stated during the prosecution of the 5,847,016 Patent that "those references (prior art) fail to teach or disclose the present invention, which relates to extrusion of a composite of cellular plastic and wood fiber into a predetermined profile for use as a picture frame or window, wall or door molding". However, a review of the prosecution history discloses that such language was not used by the applicants to define the claimed invention. Instead, the prosecution history discloses that the distinction over the prior art references related to the use of foamable plastics in a manner different than the 927 Patent claims. The distinctions did not relate to the ultimate use of the material as a door, picture frame or window frame. Accordingly, this preamble phrase is not a limitation of Claim 1.

*"wood flour"*

Marley proposes that the limitation "wood flour" should be construed to mean wood flour in its raw particle form in the first stage of the process (the first and second time the term is used in Claim 1) and as wood flour in the form of pellets in the second stage (the third time it is included

5

in Claim 1). Mikron proposes that the term is defined as a finely ground, particulate of wood at all times.

The parties agree that wood flour is a finely ground, particle of wood. The preferred embodiment supports such construction, stating: "the wood flour is preferably hardwood in the form of sawdust. The wood flour is ground to a preferred particle size...." Furthermore, the parties agree that the first two times the term is used in Claim 1, wood flour is in the form of a finely ground particle. The dispute arises the third time the term is used in Claim 1. Marley asserts that the form of the wood flour is a pelletized form. Mikron asserts that the wood flour is still in the form of a finely ground particle.

Generally, the same wording appearing in the same claim is interpreted consistently. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998). However, identical terms may take on different meanings if the language of the written description is sufficient to put a reader on notice that the term has different meanings. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1310-11 (Fed. Cir. 1999).

Here, the term wood flour is used three times in Claim 1. The specification provides that wood flour is a finely ground particle [of wood]. Marley attempts to read the term "pellet" into the term the third time it is used in Claim 1. However, when the inventors wanted to specify that the form of the material was "pellets", they did so throughout the specification, *i.e.*, "[a]fter preparation of the polymer and wood fiber pellets", "[t]he polymer/wood fiber pellet". Marley contends that construing the term wood flour the third time the term is used as only a particle of wood and not a pellet renders the embodiments nonsensical and defeats the entire purpose of the invention. However, the term wood flour can still be construed to be a finely ground particle of wood without

6

rendering the embodiments nonsensical and defeating the entire purpose of the invention. While the foam material in the second step of the process contains wood flour in particle form in the parts (volume) of 15-140 that is encapsulated in a pellet, the wood flour that is encapsulated is still a finely ground particle of wood. Accordingly, the limitation "wood flour" is construed to mean a finely ground particle of wood.

### *"in parts (volume)"*

The parties dispute the "in parts (volume)" limitation of Claim 1. Marley contends that the limitation should be construed to mean the measured proportions of the parts of the formulation for a specified container. Mikron contends that the limitations should be construed to mean the proportional volumetric quantity of one material component to all other components within a given formulation.

"Part" is defined as "one of equal or unequal portions into which something is or is regarded as divided; something less than whole". Webster's Third New International Dictionary 1645 (3rd ed. 1986). "Volume" is defined as "space occupied or enclosed by cubic units (as inches, feet, quarts, pecks, bushels, gallons)", Webster's Third New International Dictionary 2563 (3rd ed. 1986), "the amount of space, measured in cubic units, that an object or substance occupies; the measured amount that a container or other object can hold", Random House Webster's College Dictionary 1461 (2nd ed. 1999).

Marley interprets "volume" to mean a specified container or, as stated by Marley in their opening *Markman* brief, "the 'parts' of the specified volume are percentages of a whole where the reference amount of the whole is 100 parts." This construction fails to give meaning to the term as used in the claim. For example, under Marley's interpretation, a batch could be made in a 1-liter

7

container; such batch could include wood flour in a percentage (part) of 15 - 140. Using the lowest "part" of wood flour, the batch would be made with 15 percent (parts) of wood flour -- 15 percent of the 1-liter container would consist of wood flour (*i.e.*, 150 milliliters). If the largest "part" of wood flour was used to make the batch, the batch would be made with 140 percent (parts) of wood flour -- 140 percent of the 1-liter container would consist of wood (*i.e.*, 1.4 liters or 1400 milliliters). However, the 1-liter container can only hold 100 percent – 1 liter or 1000 milliliters. Accordingly, Marley's construction is not correct.

On the other hand, Mikron's proposed construction does provide meaning to the term "volume". For example, if a 1-liter container was used to make a batch and milliliters was used as the unit volume, the batch could be made with 40 to 140 milliters of wood flour. This construction gives meaning to the term "volume", enclosed in parenthesis, as used in the claim, *i.e.*, to designate the unit of measurement of the ratio – volumetric or spatial – as opposed to other types of ratios which the patent does not include, *e.g.*, weight.

Based on the above, the term in part (volume) is construed to mean the proportional volumetric quantity of one material component to all other components.

### *"encapsulating"*

The parties dispute construction of the term "encapsulating" of Claim 1. Marley contends that the term should be construed to mean "to provide a coating about the wood fiber particles with the polymer resin and prevent or minimize the penetration of moisture into the fiber particle." Mikron contends that the limitation should be construed to mean "completely enclosing each wood flour particle with polymer resin".

"Encapsulate" is defined as "to surround, encase, or protect in or as if to capsulate".

Webster's Third New International Dictionary 745 (3rd ed. 1986). The specification states that "the present process is understood to encapsulate or provide a coating about the wood fiber particles with the polymer resin and prevent or minimize the penetration of moisture into the fiber particle."

Defendant attempts to add the requirement that the wood fiber be "completely" enclosed. However, such a requirement is not suggested by the ordinary and accustomed meaning of the term or supported by the patent specification. Accordingly, the term encapsulate is construed to mean "to surround or encase".

*"high intensity mixing"*

The parties do not dispute the construction of the limitation "high intensity mixing". Mikron contends that the term should be construed to mean "the process employed to distribute solid and liquid components with the express purpose of dispensing them in a polymer (or plastic resin). Marley contends that the limitation should be construed to mean "the process employed to distribute solid and liquid components with the express purpose of dispensing them in a polymer resin." This construction is supported by the ordinary and accustomed meaning of the term and the patent specification. Accordingly, high intensity mixing is construed to mean "the process employed to distribute solid and liquid components with the express purpose of dispensing them in a polymer resin".

*"wood flour: 15-140"*

The parties dispute the calculation of the amount of wood flour in the final product based on the limitation "wood flour 15-140" as found in Claim 1. The parties agree that minimum amount of wood flour used in the first stage or formulation is 11.11% (15 parts/135 total parts). The parties also agree that minimum amount of wood flour used in the second stage or second formulation is

9

10.7% (15 parts/140 total parts). The difference in the amount of wood flour between the first and second stage is due to the addition of up to 5 parts of blowing agents during the second stage, changing the total amount of parts to 140.

Marley contends that the percentage of wood flour in the final product is 1.18% based on its interpretation that the wood flour in the final product is a portion of the pellets, which are a portion of the final mixture. Accordingly, Marley contends that the percentage of wood flour in the final product is 11.1% of 10.7%. However, Marley's construction is based on its interpretation that the list of materials in each stage is a "recipe" and that an amount of 100 parts of polymer resin could be used in the first stage, and an additional 100 parts of polymer resin could be used in the second stage. The same would apply to the other ingredients, up to 5 parts of stabilizers and lubricants and up to 10 parts of process aids in both the first and second stage. This interpretation is not supported by the claim or the specification.

Claim 1 states that, during the first stage of the process, an extrudable material is produced; this extrudable material consists of certain ingredients up to certain parts. Obviously if the extrudable material consists of these ingredients, these ingredients were combined to form the extrudable material. The extrudable material, which consists of the stated five ingredients, is then cut to form pellets of said extrudable material. Additional polymer resin and a blowing agent are then added with the pellets, and an extrudable foam material is formed. The claim then recites that the foam material consists of the original five ingredients as well as the blowing agents up to a maximum number of parts. The maximum number of parts for each of the original five ingredients is unchanged. The only ingredients added to the pellets in the claim is additional polymer resin and a blowing agent. Accordingly, the list of ingredients in the second stage of the process is not a

10

"recipe" to make the foam material. Instead, it is a list of the components of the foam material.

This conclusion is further supported by the specification, which states, in pertinent part:

> Only a portion of the total desired amount of resin is used in making the pellets. The remainder of the resin is added when making the final extrusion composite. For example, in a composite having 100 parts total of PVC resin, only 40 parts resin will be added to the mixture to form the pellets. The remaining 60 parts resin will be added in forming the final product.

Based on this interpretation, the theoretical minimum amount of wood flour found in the extrusion of the first stage or first formulation is 11.19% (15 parts/134 total parts). A total of 135 parts cannot be used to make this theoretical calculation because the specification clearly states that not all of the maximum 100 parts of resin are added in the first stage. The theoretical minimum amount of wood flour found in the extrusion of the second stage or second formulation is 10.7% (15 parts/140 total parts). Therefore, this theoretical minimum percentage of wood flour in the final product would also be 10.7% as no materials are added following the second stage. Accordingly, the limitation "wood flour 15-140" as found in Claim 1 is construed to have a theoretical minimum percentage of wood flour in the final product of 10.7%.

Based on the above, the disputed claims of the 927 Patent are construed as follows: (1) the Preamble phrase "for use as a door, window, or frame molding" is not a limitation of Claim 1; (2) "wood flour" is a finely ground particle of wood; (3) "in parts (volume)" is the proportional

volumetric quantity of one material to all other components; (4) "encapsulating" is to surround or encase; (5) "high intensity mixing" is the process employed to distribute solid and liquid components with the express purpose of dispensing them in a polymer resin; (6) "wood flour: 15-140" has a theoretical minimum percentage of wood flour in the final product of 10.7%.

Dated: September 4, 2003

JOHN W. DARRAH
United States District Judge